# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TED THOMPSON,

        *Plaintiff*,

vs.

        Case No. 07-1062-EFM

UNION SECURITY INSURANCE
COMPANY,

        *Defendant.*

## MEMORANDUM AND ORDER

This matter comes before the Court pursuant to the Employee Retirement Income Security Act of 1974 (ERISA).[1] From 1984 until January 2003, Plaintiff Ted Thompson was employed by Wichita Anesthesiology, Chartered (WAC) as a certified registered nurse anesthetist (CRNA), where he continued in that capacity until January 2003, when Thompson claims he became unable to work because of "cerebral artery dissections." This neurological incident left Thompson with cognitive deficits in verbal expression and processing, and recurring severe migraine headaches. As a WAC employee, Thompson was a participant in an employee benefit welfare plan insured through a Group Long Term Insurance Policy by Fortis Benefits Insurance Company.[2] Pursuant to that plan, on May 5, 2003, Thompson began receiving long term disability benefit payments, which Insurance Company terminated on April 27, 2005 on the basis that Thompson no longer qualified for such

---

[1] 29 U.S.C. § 1001, *et seq.*

[2] Fortis Benefits Insurance Company is the former corporate name of Union Security Insurance Company. To avoid confusion, the Court will identify Defendant hereinafter as "Insurance Company."

benefits under the terms of the policy. On September 6, 2005, Thompson filed an administrative appeal on the denial of benefits. While receiving his initial disability benefits and during his appeal, Thompson underwent numerous evaluations by his treating physicians, and his medical records and appeal file were reviewed by a number of Insurance Company's personnel, all of which are discussed in detail later in this opinion. After receiving no decision on his appeal, Thompson filed this action on March 5, 2007. The following day, Insurance Company denied Thompson's administrative appeal. Both Thompson and Insurance Company now seek summary judgment on Thompson's disability claim.[3]

## I. Standard

The Court is familiar with the standards governing the consideration of Summary Judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[4] An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim.[6] In considering a motion for summary judgment, the Court must

---

[3]To avoid confusion, for citation to the administrative record, the Court will first cite to the Court record, indicating the docket page number corresponding to the administrative record, which has been filed as multiple attachments to the parties' briefs, followed by a parenthetical of the document's Bates number.

[4]Fed. R. Civ. P. 56(c).

[5]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[6]*Id.*

examine all of the evidence in a light most favorable to the nonmoving party.[7]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.[8]  The moving party is not required to disprove the nonmoving party's claim or defense, but must only establish that the factual allegations have no legal significance.[9]  If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial.[10]  In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations.[11]  The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[12]

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

## II. Analysis

### 1. Denial of Disability Benefits

Thompson contests the plan administrator's decision to deny disability benefits, claiming that the administrator failed to follow ERISA claim procedures, United States Department of Labor

---

[7]*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[8]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[9]*Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

[10]*Celotex*, 477 U.S. at 323.

[11]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[12]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[13]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

regulations, and Insurance Company's own claim procedures, and failed to provide him with a full

and fair review. The first issue raised by both parties is the appropriate standard of review.

Thompson argues that the Court should review Insurance Company's denial of benefits *de novo*,

while Insurance Company contends that the arbitrary and capricious standard is required.

The Tenth Circuit has addressed the federal court's standard of review for denial of ERISA

claims:

> A denial of benefits covered by ERISA is to be reviewed under a *de novo* standard
> unless the benefit plan gives the administrator or fiduciary discretionary authority to
> determine eligibility for benefits or to construe the terms of the plan. If the benefit
> plan gives discretion to a plan administrator, then a decision denying benefits is
> typically reviewed under an arbitrary and capricious standard. Such review is limited
> to determining whether the interpretation of the plan was reasonable and made in
> good faith.[14]

The parties, however, disagree as to the benefit plan that both governs Thompson's disability claim

and which this Court should review to determine the appropriate standard of review.

### ERISA Plan

Thompson asserts that the Plan in effect at the time of his disability, and which governs in

this case, is the July 1, 1994 benefits plan ("Original Plan" or "Plan").[15] Thompson contends that

the Original Plan did not provide the administrator with discretionary authority to determine

eligibility of benefits, and as such, a *de novo* review is required. In addition, Thompson argues that

the Original Plan set forth the specific process that the parties were required to follow to either

change or waive any provision of the plan, providing that "[t]he *policyholder* [WAC] owns the

---

[14]*Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189 (10th Cir. 2007), *abrogated in part by Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187 (10th Cir. 2009) (internal quotations and citations omitted).

[15]Insurance Company agrees that at the time of Thompson's disability, the Original Plan was in effect.

*policy,*" which "may be changed at any time by an endorsement or amendment agreed upon by the *policyholder* [WAC] and us [Insurance Company]."[16]  This change provision not only requires that any change be agreed upon by WAC, but further requires that any change be approved by an executive officer of Insurance Company, and prohibits change or waiver of any plan provision by any agent.[17]   Thompson argues that because Insurance Company failed to follow this required procedure, no plan subsequent to the Orignial Plan is controlling.

Even if Insurance Company had discretionary authority under a plan, Thompson contends *de novo* review is warranted based on serious procedural irregularities that occurred during his review process.  These procedural irregularities include Insurance Company's failure to follow ERISA claims procedure, its own claims procedure, and DOL regulations.

Insurance Company, however, disagrees, arguing that a new plan, effective January 1, 2004 (2004 Plan), governed.  Insurance Company asserts that the 2004 Plan grants the plan administrator with the discretionary authority necessary to trigger the arbitrary and capricious standard.  Specifically, the 2004 Plan provides: "[t]he *policyholder* [WAC] delegates to us and agrees that we have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the *policy*.  All determinations and interpretations made by us are conclusive and binding on all parties."[18]

Thompson's primary argument is that Insurance Company failed to render a decision on his denial of benefits appeal pursuant to either the Original Plan or the 2004 Plan, or within the

---

[16]Doc. 45-2, p.32 (US32) (emphasis in original).

[17]*Id.* (emphasis in original).

[18]Doc. 45-4, p.51 (US332) (emphasis in original).

deadlines imposed by ERISA. The Original Plan is silent as to the timeframe Insurance Company

was required to provide its decision to Thompson regarding review of his appeal, and in such a case,

we turn to the ERISA guidelines, discussed below. The 2004 Plan, however, includes a provision

outlining Insurance Company's review procedure for denying a claim.[19] The 2004 Plan provides that

a request for review of a claim denial must be in writing and must be submitted within 180 days of

receipt of the notice of denial. Consistent with ERISA guidelines, the 2004 plan further provides:

> You have the right to review, upon request and free of charge, copies of all documents, records, and other information relevant to your claim for benefits, and you may submit written comments, documents, records and other information relating to your claim for benefits.
>
> We will review your claim after receiving your request and send you a notice of our decision within 45 days after we receive your request, or within 90 days if special circumstances require an extension. We will state the reasons for our decision and refer you to the relevant provisions of the *policy*. We will also advise you of further review procedures, if any.[20]

Thompson filed his administrative appeal on September 26, 2005, and on March 28, 2006,

Insurance Company, through its disability appeals specialist, notified Thompson that all information

for his claim had been provided and that a review based on that information would proceed. From

March 28, 2006 to September 18, 2006, Insurance Company conducted its review of Thompson's

claim, which included sending his file to various physicians for independent review. Insurance

Company claims that throughout this review process, it communicated with Thompson on at least

seven occasions to apprise him of the status of his claim, the last communication occurring on

---

[19] *Id.* at 52 (US333).

[20] *Id.* (emphasis in original); *see also* 29 C.F.R. § 2560.503-1(i)(1), (i)(3)(I) (providing that for a disability claim, the plan administrator must notify a claimant of an adverse benefit determination within 45 days after receipt of a claim, but that period may be extended an additional 45 days if the plan administrator determines such an extension is necessary, and if notice of the extension is provided to the claimant identifying the special circumstances requiring the extension within the initial 45-day period).

August 4, 2006.[21]  On March 5, 2007, seven months after the last communication (and nearly a year after Insurance Company indicated that the claim was fully submitted), after receiving no decision on his claim from Insurance Company, Thompson filed this lawsuit.  The next day, on March 6, 2007, Insurance Company issued its final benefit determination, denying Thompson's appeal of the denial of disability benefits.

Thompson and Insurance Company agree that at the time of Thompson's disability, the Original Plan controlled.  However, Insurance Company argues that in January 2004, the 2004 Plan became effective and now governs the procedural aspect of Thompson's claim.  Thompson disagrees, and asserts that the administrative record is void of any proof that the WAC in fact assented to the 2004 Plan, and simply because Insurance Company inserted the 2004 Plan into the record is no proof that it was accepted by WAC, as the Original Plan requires.  Insurance Company argues that WAC had the ability at any time to enter into and accept the 2004 Plan, which Insurance Company claims, is a new plan and not an amendment to the Original Plan.  It is interesting, however, that Insurance Company has not refuted Thompson's claim with respect to the 2004 Plan by either indicating that WAC, in fact, actually did agree to the 2004 Plan by providing an affidavit or any other documentation demonstrating acceptance of any subsequent plan.  Insurance Company's response has simply been to present the Court with the conclusory statement that the 2004 Plan governed.  In addition, Insurance Company's claim that the 2004 Plan is a "new plan" is confusing in light of its purported March 2007 amendment, which indicates that amendment was to be effective back to March 1, 1995, predating the 2004 Plan.  Insurance Company has provided no information

_____

[21]Thompson contends that Insurance Company's decision to send his file to one physician at a time rather than sending the file simultaneously to all physicians was an unnecessary delay in deciding his appeal and not in compliance with ERISA guidelines or any benefit plan.

or evidence to clear up the discrepancies between the plans or amendments. Based on the information before the Court, we conclude that the Original Plan, i.e., the 1994 policy, governs for purposes of this case.[22]

Regardless of which benefit plan was in effect, however, we reach the same result and conclude that a *de novo* review is warranted in this case. Here, because the Original Plan failed to provide the plan administrator with discretionary authority, a *de novo* review is the applicable standard under that plan.[23] As previously discussed, the 2004 Plan grants the plan administrator with the discretionary authority to determine eligibility of benefits, and under normal circumstances, a deferential standard of review would be appropriate. However, the circumstances in this case dictate otherwise.

A plan administrator must not only "be given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion."[24] In *Gilbertson*, the Tenth Circuit Court of Appeals concluded that a plan administrator granted discretionary authority was not entitled to judicial deference when the delay in deciding a claim resulted in its being "deemed denied."[25] The appellate court reasoned:

> It follows that where the plan and applicable regulations place temporal limits on the administrator's discretion and the administrator fails to render a final decision within those limits, the administrator's "deemed denied" decision is by operation of law

---

[22]Other than the provision providing discretionary authority to Insurance Company, the Court finds no other meaningful differences between the Original Plan and the 2004 Plan affecting Thompson's disability claims in this matter.

[23]*See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[24]*Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009) (citing *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003)).

[25]*Gilbertson*, 328 F.3d at 631.

rather than the exercise of discretion, and thus falls outside the *Firestone* exception.[26]
The Tenth Circuit recently applied this same reasoning in *Rasenack*, finding that when a plan administrator "failed to render a final decision *within the temporal limits*" set forth in the plan and applicable regulations, the benefit claim is "deemed denied" by operation of law and "*Firestone* deference no longer applies."[27]

Pursuant to the 2004 Plan and 29 C.F.R. § 2560.503-1,[28] the plan administrator was required to render a decision within 45 days after Thompson's request for review, with the possibility for a 45-day extension if circumstances warranted such an extension and, if the administrator provided Thompson with notice of such extension. Here, the plan administrator violated both the deadlines of ERISA and those deadlines incorporated into the 2004 Plan. Insurance Company notified Thompson by letter on March 28, 2006 that all the information for Thompson's claim had been provided, and it was proceeding with the review. Based on that date, and taking into account a 45-day extension, the administrator was required to render a decision by June 26, 2006; however, no decision issued. Even assuming, arguendo, that the time for issuing a decision did not begin to run until after Insurance Company last communicated with Thompson on August 4, 2006 (which, we note, was *during* Insurance Company's review of Thompson's appeal), the decision issued on March 6, 2007 substantially exceeded the temporal limits of the 2004 Plan and ERISA regulations, warranting *de novo* review.

Insurance Company further asserts that, while the delay in issuing its decision was not in

---

[26]*Id.*

[27]*Rasenack*, 585 F.3d at 1316 (emphasis added).

[28]29 C.F.R. § 2560.503-1 also governs with regard to the Original Plan.

compliance with its claim procedures, it was in substantial compliance with ERISA as its decision was based on a full and fair review of the administrative record, and thus, was reasonable. Accordingly, it argues the Court should excuse its failure to render a timely decision and apply the arbitrary and capricious standard of review. Insurance Company attributes the delay on "Ms. Myers' personal circumstances at the time,"[29] but provides no other reasoning for why there was no communication with Thompson updating him on the status of his appeal for months, or why it failed to render a decision until after Thompson filed the instant lawsuit. We, therefore, reject Insurance Company's arguments.

As the Tenth Circuit explained:

> [A]n administrator who fails to render a timely decision can only be in substantial compliance with ERISA's procedural requirements if there is an ongoing productive evidence-gathering process in which the claimant is kept reasonably well-informed as to the status of the claim and the kinds of information that will satisfy the administrator.[30]

Thus, a plan administrator substantially complies with a deadline if the delay is both inconsequential and the delay is "in the context of an on-going, good-faith exchange of information between the administrator and the claimant."[31] Here, Insurance Company's evidence gathering process was complete, and a delay in excess of seven months with no communication taking place between the plan administrator and Thompson hardly demonstrates a good-faith effort on behalf of the plan

---

[29]Doc. 98, p.15 (Insurance Company's Motion for Summary Judgment).

[30]*Rasenack*, 585 F.3d at 1317; *see also Gilbertson*, 328 F.3d at 636.

[31]*Rasenack*, 585 F.3d at 1317 (citing *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1173-74 (10th Cir. 2004)).

administrator so as to warrant a finding of substantial compliance with ERISA regulations.[32] Therefore, as a result of the foregoing, we conclude that *de novo* review of the plan administrator's denial of Thompson's benefits claim is warranted. Because we review Thompson's claim *de novo* and apply no deference to the plan administrator's decision, we need not address Thompson's claim regarding conflict of interest.[33]

### De Novo Review

"When applying a *de novo* standard in the ERISA context, the role of the court reviewing the denial of benefits is to determine whether the administrator made a correct decision."[34] The standard "is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the court's independent review."[35] While the administrator's decision is accorded no deference or presumption of correctness, the administrator's decision is still the decision under review.[36]

Although we review this case *de novo*, the burden of proof remains with Thompson to prove by a preponderance of the evidence that he is disabled within the meaning of the Plan.[37] To meet this

---

[32]Thompson's claim that Insurance Company unnecessarily delayed the review process by providing his file to one reviewer at a time rather than to all reviewers simultaneously is not without merit; however, because that process does not impact the Court's decision in this case, we need not address that or any other procedural irregularity not already addressed.

[33]*See Gilbertson*, 328 F.3d at 631 (concluding that judicial deference to plan administrator's decision not required on *de novo* review).

[34]*Niles v. American Airlines, Inc.*, 269 Fed. Appx. 827, 832 (10th Cir. 2008) (citing *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002)).

[35]*Id.* at 833.

[36]*Id.* at 832.

[37]*Niles v. American Airlines, Inc.*, 563 F. Supp. 2d 1208, 1214-15 (D. Kan. 2008) (citing *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992)).

burden, Thompson must prove that as a result of his injury or medical condition, he is unable to perform "at least one of the *material duties* of each *gainful occupation* for which [his] education, training, and experience qualifies [him]."[38] "Material duties" means in part, "the set of tasks or skills required generally by employers from those engaged in a particular occupation."[39] A "gainful occupation" must be one in which a person "could reasonably be expected to earn at least as much as [that person's] Schedule Amount," which in this case, the parties agree is $1,500 per month.[40]

Thompson first claims that over the course of his career, he has received highly specialized education, training, and experience as a CRNA, a distinct specialty that requires him to perform duties much different from that of the typical registered nurse (RN). Thus, he contends that he is qualified to work *only* as a CRNA, and does not have the appropriate background, training, or experience to work in other nursing positions. In addition, Thompson claims that even if he were qualified to work in other nursing positions, he is unable to perform the material duties required by those positions due to his medical condition. In support of this claim, Thompson relies on the conclusions of Ray Fisher, M.D., along with that of Jessica Horsfall, Ph.D. and Susan Bookheimer, Ph.D., neuropsychologists with UCLA. From these opinions, Thompson asserts that he is incapable of working under pressure, and in unable to think and act quickly. He argues that his severe verbal deficit precludes him from communicating effectively with patients or other medical personnel, to which he contends is a material requirement of any nursing position. Moreover, Thompson claims that the possibility of sudden migraines, which require him to lie down and rest in order for them to

---

[38]Doc. 45-2, p.10 (US10) (emphasis in original).

[39]*Id.* at 12 (US12).

[40]*Id.*

abate, would also preclude him from performing in any registered nursing position.

### Dr. Ray Fisher

Dr. Fisher served as Thompson's treating physician and evaluated him on January 27, 2003 after he complained of a severe episode of dizziness, near-syncope, and paresthesias of the left side of his body. Because of these symptoms, Thompson was admitted to the hospital.[41] At that time, Dr. Fisher assessed Thompson's functional ability as severely limited, indicating he was incapable of even minimal activity or sedentary work.[42] Dr. Fisher conducted several follow-up evaluations on Thompson after his hospitalization, whereby Dr. Fisher provided his impression of Thompson's progress, or the lack thereof.

On February 4, 2003, Dr. Fisher evaluated Thompson and indicated that he continued to have events, identified as possible vasospasms, where he would have intermittent tingling on the left side of his body, but had no associated weakness, dizziness or near syncope, and no acute events associated with head movement. Dr. Fisher further noted that while these vasospasms have gradually diminished over time and have not been severe, they are still occurring.[43] Nearly two weeks later, on February 14, 2003, Dr. Fisher noted that Thompson continued to experience intermittent episodes of tingling on the left side of his body, but stated that Thompson was otherwise neurologically intact.[44]

Dr. Fisher next examined Thompson on March 3, 2003, where Thompson complained of

---

[41]Doc. 45-8 pp.4-6 (US855-857).

[42]*Id.* at 8 (US859).

[43]Doc. 45-6, pp.147-48 (US708-709).

[44]*Id.* at 149 (US710).

having frequent episodes of tingling on the left side of his face, but no other symptoms. At this point, Thompson has had occasional severe episodes leaving him "fatigued and stunned the rest of the day."[45] Dr. Fisher further noted slight improvement regarding Thompson's migraine episodes.[46]

On March 25, 2003, Dr. Fisher indicated that Thompson experienced one major event that was stress-induced. Otherwise, events (vasospasms) were less frequent and fairly brief, lasting five minutes or less. Thompson continued to have name and word-finding difficulties, and further evaluations were discussed. Dr. Fisher recommended that Thompson stay on disability.[47]

On April 21, 2003, Dr. Fisher noted that Thompson continued to have what was believed to be vasospasm episodes, causing lightheadedness and tinnitus (ear ringing) lasting fifteen to twenty minutes, and had more severe episodes that lasted most of the day. As of this evaluation, however, Thompson had not had a severe episode for seven to ten days.[48] One month later, on May 27, 2003, Dr. Fisher conducted another follow-up evaluation of Thompson after he was evaluated by Dr. Susan Bookheimer at UCLA, at which time Dr. Fisher noted that Thompson's migraines have been significantly improved with medication.[49]

On July 28, 2003, Thompson was noted to have had some migrainous episodes, but no residual symptoms at the time of this appointment. Dr. Fisher also noted that Thompson "feels like his episodes are 75% better."[50] Thompson continued to have difficulty with word-finding, and Dr.

---

[45]Doc. 45-7, p.1 (US711).

[46]*Id.*

[47]*Id.* at 2 (US712).

[48]*Id.* at 3 (US713).

[49]*Id.* at 4 (US714).

[50]*Id.* at 5 (US715).

Fisher opined that Thompson "is unable to work as a CRNA because he just cannot problem solve that quickly or lift patients or do heavy exertion."[51] Insurance Company's disability forms were completed, whereby Dr. Fisher re-assessed Thompson's impairment, indicating that he was "able to engage in only limited stress situations and engage in only limited interpersonal relations."[52] Dr. Fisher qualified that assessment, remarking that Thompson cannot lift patients nor could he be responsible for patients under anesthesia. Further, in describing how Thompson's limitations affect his ability to work, Dr. Fisher explained that Thompson "cannot function well under high stress (complicated decision making jobs)," but that Thompson would be able to work with his impairment with job modification, keeping the aforementioned limitation in mind and, precluding work as a CRNA.[53] In December 2003, Dr. Fisher reaffirmed his opinion that Thompson was unable to work due to cognitive issues.[54]

On April 4, 2004, Dr. Fisher conducted yet another follow-up evaluation, noting that Thompson had continuing episodes of "short bouts of brief dizziness, ringing in the ears, [and the] sense of unsteadiness."[55] Dr. Fisher's impression on this visit was that he saw Thompson "as continually disabled from being able to work under stressful conditions. His former job was a nurse anesthetist and I see no way that he will ever be able to return to that. I consider this a permanent

---

[51]*Id.*

[52]*Id.* at 51(US761).

[53]*Id.*

[54]*Id.* at 6 (US716).

[55]*Id.* at 7 (US717).

disability for him being a nurse anesthetist."[56]  Thompson returned to see Dr. Fisher on July 21, 2004 after experiencing more frequent episodes of dizziness, numbness, headaches, and poor balance that increased with head turning.  As a result of these symptoms, further testing was recommended.[57]

The next evaluation of Thompson by Dr. Fisher that the Court was able to locate in the administrative record was conducted nearly five months later on December 1, 2004, where Thompson complained of recurring events of dizziness, nausea, and numbness on his left hand and face that lasts several minutes per episode.  Dr. Fisher found Thompson clinically stable, but noted that Thompson "is disabled.  The stress would induce symptoms.  He has not had any ability to work, and he remains permanently disabled from his usual occupation of nurse anesthetist."[58]  Dr. Fisher again examined Thompson on April 22, 2005, where he noted that Thompson continued to experience what he believed to be migraines that caused infrequent episodes of numbness, intermittent episodes of confusion, and speech disturbance, but these episodes occur without any precipitating event.  Dr. Fisher further noted that Thompson "has not had any severe ones or anything that impairs his ability to do things.  Often though he will have to lie down and rest to abort them."[59]  Insurance Company terminated Thompson's disability payments on April 27, 2005.

On August 15, 2005, Thompson was seen by Dr. Fisher due to abdominal distress and episodes resulting in tinnitus and numbness on the left side of his face "that have become constant

---

[56]*Id.* at 7-8 (US717-718).  On May 18, 2004, Thompson was evaluated by Drs. Jessica Horsfall and Susan Bookheimer at UCLA.  That evaluation is discussed later in this opinion.

[57]*Id.* at 9 (US719).  The Court was unable to discern the outcome of any additional testing from the administrative record.

[58]Doc. 45-3, p.71 (US211).

[59]*Id.* at 69 (US209).

for several times a day."[60]  Thompson had also been experiencing migrainous vasospasm spells two

to three times a week, occurring abruptly and without warning, lasting fifteen to sixty minutes in

duration.[61]  Dr. Fisher noted that Thompson demonstrated very slow speech.

On September 14, 2005 at the request of Thompson's counsel, Dr. Fisher provided a written

opinion of Thompson's medical status as of August 2005 based on his evaluations:

> I saw Mr. Thompson on August 15, 2005 for an upper abdominal pain problem.  At
> that time it seemed to come on after a colonoscopy and at that time he was having
> more episodes of tinnitus and left facial numbness that were several times a day.  The
> majority of the time in recent months, he has had migrainous vasospasm spells where
> he gets left-sided facial and sometimes hand numbness which will come on abruptly.
> These will last 15 to 60 minutes.  He will have associated dizziness and usually
> requires rest in the supine position to give him relief.  Note in 2003 he had the onset
> of these vasospastic migrainous episodes, which at that time, were occurring 5 to 20
> times per day.  These were significantly reduced with the use of Topamax at 25 mg
> a day and at one point we increased him to 50 mg a day.  Mr. Thompson was
> reevaluated at UCLA by Jessica Horsfall in May of 2004, and at that time, she found
> limitations in his speech regarding production and expression.   She observed
> substantial deficits in verbal expression and processing, consistent with an expressive
> language disorder.  I have continued to observe this major problem with Mr.
> Thompson and even in casual social gatherings where I have observed him, he may
> take up to three to four minutes to complete a phrase or come up with the proper
> words to express himself.  In 2004, Ms. Horsfall suggested changing his medicine
> from Topamax to something else for migraine; however, Mr. Thompson had already
> failed migraine treatment with verapamil and Dr. Kidwell felt like Topamax was the
> best option.  Therefore, Mr. Thompson and I agreed that it was best to stay with the
> Topamax as it usually did decrease the frequency of his migrainous events.  When
> Mr. Thompson was seen on August 15, 2005, we reviewed the frequency of his
> events at that time, and through the summer months, he would have them about two
> to three times a week but they would last 15 to 60 minutes.  These would come on
> without warning.  However, there had been times, especially when stress-related
> events such as the colonoscopy and other physical stressful events, Mr. Thompson
> had very frequent events.  Mr. Thompson called me on August 31, 2005 and was
> concerned about the possibility of recurrent dissection as he was having numbness
> in his left hand and left leg.  He was immediately seen and evaluated in the Wesley
> Radiology Department with a CT angiogram.  Fortunately, this was not a recurrent

---

[60]*Id.* at 66 (US206).

[61]*Id.*

vascular dissection, but a severe episode of migrainous vasospastic event. This resolved with rest. This came on after Mr. Thompson was moving some boxes as they prepared to move from their current house.

I have reviewed the report by Mr. Hubbard[62] and as I understand, he had only a telephone call with Mr. Thompson on one occasion in December of 2004. I strongly disagree with his interpretation as I have seen Mr. Thompson several times a month within the last three to four years and I have observed Mr. Thompson to have significant delay in verbal expression and processing. Since I am a physician in the Wichita Clinic, I am very familiar with the duties of the office nurse. Mr. Thompson is not capable of performing the usual duties of an office nurse at the Wichita Clinic. I also feel like he could not work at any doctor's office as the majority of the demands are in use of verbal skills, especially the use of a telephone. I also think Mr. Thompson is extremely limited working in any health care nursing profession because of the unpredictable nature of his vasospastic migrainous events. These can come on without any warning and usually require rest in the supine position to get relief. . . .[63]

### Dr. Jessica Horsfall and Dr. Susan Bookheimer

Thompson further relies on an evaluation conducted by Jessica Horsfall, Ph.D. and Susan Bookheimer, Ph.D., each neuropsychologists with UCLA in support of his disability claim. Drs. Horsfall and Bookheimer evaluated Thompson on May 18, 2004. During this evaluation, Thompson was observed to have a "significant discrepancy between verbal and nonverbal abilities."[64] Thompson performed in the superior range for non-verbal activities, but continued to perform "well below premorbid abilities on verbal tasks."[65] With extended time, he was able to provide verbal solutions to social problems; however, his processing "was extremely slow, sometimes requiring up

---

[62]Richard Hubbard,an employee with Insurance Company's Vocational Services, conducted a labor market survey regarding Thompson's claim, and as part of that survey, had a telephone conversation with Thompson after which he expressed an opinion. Mr. Hubbard's report is discussed later in this opinion.

[63]Doc. 45-4, pp.76-78 (US357-359).

[64]*Id.* at 83 (US364).

[65]*Id.*

to 4 minutes to formulate a response."[66]

During testing on naming tasks, Thompson was able to retrieve words under untimed conditions, but when placed under timed constraints, he performed at a third grade level. Thompson was observed to have a mild decline in his fluency abilities, but despite this decline, his fluency ability was nevertheless rated as average.

Drs. Horsfall and Bookheimer further indicated that Thompson's performance in learning and memory had improved from previous testing regarding information presented in context (short stories), as did his response time, although it remained delayed. With word list memorization, however, Thompson "demonstrated an insufficient learning curve," and although he learned less than previous testing, he was able to retain 100% of that learned information. It was noted that while the test results indicate Thompson's memory is intact, "his performance was seemingly affected by his verbal expression/processing deficits and interfered with his learning process."[67] For other areas tested, such as visual-spatial functioning, motor functioning, and executive functioning, Thompson was found to perform average to superior.

In summary, Drs. Horsfall and Bookheimer noted that "[a]though [Thompson] continued to demonstrate global impairment on verbal expression tasks, he had particular difficulty on measures requiring quick responses," and due to concern with his ability to respond efficiently and effectively to stressful conditions, suggested that Thompson refrain from returning to work as a CRNA.[68] Drs. Horsfall and Bookheimer continued:

---

[66]*Id.* at 83-84 (US364-365).

[67]*Id.* at 84 (US365).

[68]*Id.* at 85 (US366).

Considering [Thompson's] significant physical symptoms in addition to his difficulties with expression and verbal/auditory processing, particularly in times conditions, we are not confident that a return to his current work is in his best interests. Mr. Thompson is a bright, motivated, insightful individual, and he would continue to do well with the more thoughtful and intellectual tasks involved in nursing that do not involve acute stress, rapid responding, and fine decisions about anesthesia. He will work well at a slower, more relaxed pace where he is not required to formulate urgent responses and where he may have more time to process information. For example, he may be able to work in a more managerial position where he can utilize his intellectual abilities in untimed conditions.[69]

Drs. Horsfall and Bookheimer suggested that Thompson would benefit from antidepressant treatment, theorizing such treatment could increase his information processing speed. They concluded by noting that "although [Thompson's] cognitive abilities have likely stabilized, given the mild decline noted on some tasks, he may benefit from re-evaluation in the future to monitor his cognitive processing abilities for improvement or decline, particularly if his subjective experience suggests a change in his abilities."[70]

### Dr. Patricia Neubauer

In addition to those evaluations conducted by Dr. Fisher, and Drs. Horsfall and Bookheimer, Thompson's file was reviewed by a number of individuals at Insurance Company's request, which Insurance Company contends support its position that Thompson is not disabled under the Plan's

---

[69]*Id.*

[70]*Id.* at 86 (US367). Thompson also relies on evaluations conducted by Susan McPherson, Ph.D., also a neuropsychologist, in March 1999 and again in September 1999. Thompson claims that Dr. McPherson recommended that he not return to work based on grave concerns of his ability to handle multiple tasks simultaneously, particularly under stress. He also claims Dr. McPherson raised concerns about his ability to respond to questions and formulate answers to his thoughts in an expedient fashion. The only document in the administrative record to which Thompson cites in support of Dr. McPherson's findings is a Neurological Summary Sheet that lists particular tests conducted and corresponding scaled scores, and, does not include a statement of conclusions reached by Dr. McPherson as a result of those tests. *See* Doc. 45-2, pp.115-18 (US115-118). Such a document is not of much use to the Court where the testing neuropsychologist's interpretation of such results is absent from the administrative record, and thus, we treat Thompson's representations of Dr. McPherson's conclusions as unsupported.

"each gainful occupation" definition of disability. On October 7, 2004, Patricia Neubauer, a staff psychologist with Insurance Company, reviewed Dr. Fisher's records from January 3, 2003 to July 21, 2004, as well as Dr. Horsfall's May 18, 2004 evaluation of Thompson. Dr. Neubauer concluded that Thompson was capable of working, but agreed that he was no longer able to work at a CRNA or other more stressful or fast paced nursing specialty roles.[71] Relying on Dr. Horsfall's belief that Thompson was capable of working as a nurse where duties did not place him under time pressure or acute stress, or require critical decisions, Dr. Neubauer opined that he "likely would be able to function in roles in which assessment and health education are primary duties."[72] While acknowledging Dr. Horsfall's conclusion that Thompson's language difficulty could be a barrier to his performing in nurse management positions, Dr. Neubauer concluded that Thompson's expressive language difficulty could be improved with speech therapy.

### Dr. Allen Parmet

On November 8, 2004, again at Insurance Company's request, Dr. Allen Parmet, M.D., conducted a review of Thompson's medical records, which according to his report, consisted of Dr. Fisher's January 3, 2003 to July 21, 2004 evaluations, and the May 18, 2004 examination conducted by Drs. Horsfall and Bookheimer. Dr. Parmet's review resulted in the following brief discussion and conclusion:

> Mr. Thompson's condition apparently resulted in some cognitive deficits, although there are no focal neurologic lesions identified. His cognitive deficits affect him in higher functions but not significantly on a physical basis. He continues to have complaints of headache and some unsteadiness. I am in agreement with the evaluating neuropsychologist that he would not be able to return to function as a

---

[71]Doc. 45-9, pp.1-2 (US994-995).

[72]*Id.* at 2 (US995).

nurse anesthetist, due to the complex problems that need to be solved on a daily basis and in a timely manner. However, he retains adequate cognitive function and physical ability that he would be able to fill many other positions as a nurse within that occupation.

[Thompson] is physically capable of performing his occupation as a nurse. Vocational assessment of his residual abilities could be performed to determine appropriate employment. Updated medical records, regarding his most recent complaints and objective testing, should also be obtained to determine if there have been recent changes in his status.[73]

### Dr. Daniel Zimmerman

In addition to Dr. Parmet, Insurance Company also hired Daniel Zimmerman, M.D. to conduct a review of Thompson's medical records as part of his appeal. Dr. Zimmerman's April 24, 2006 report, although chronologically disjointed, describes Thompson's medical and work history from 1998 through his August 2005 gastrointestinal complaints to Dr. Fisher. Dr. Zimmerman noted Thompson's cognitive problems, including his word finding difficulties, his ongoing vasospastic migraine headaches, and further, recognized that Dr. Fisher noted that Thompson was demonstrating slowed response time in social conversations since his 2003 episode. Dr. Zimmerman concluded that "[c]onsidering signs, symptoms, diagnostic studies, and recommendations from treating sources, this individual is capable of medium work activity . . . on a full time basis. The ability to respond to critical situations requiring acute judgment has been precluded by caregivers. This recommendation by caregivers is relevant and appropriate."[74]

### Dr. Margaret O'Connor

Margaret O'Connor, Ph.D. also provided an opinion of Thompson's level of functionality

---

[73]Doc. 45-4, p.114 (US395).

[74]Doc. 45-3, p.2 (US142).

based on a review of his medical records on June 6, 2006. Dr. O'Connor reviewed Thompson's neurological tests and other medical records of his treating physicians from March 1998 to August 2005. Dr. O'Connor opined that, based on Dr. Bookheimer's evaluation and Dr. Fisher's evaluation notes, she was "inclined to believe that [Thompson] had difficulty with word retrieval and processing speed," and indicated that it is likely that his verbal difficulties are stable and will remain mildly deficient indefinitely.[75] The records further suggest that Thompson meets the criteria for diagnosing a cognitive disorder related to his prior carotid dissection. Dr. O'Connor further opined that Thompson's cognitive deficiencies would not prevent him from functioning in a work setting, noting that "Thompson has many cognitive strengths (memory, divided attention, visuospatial functions and executive abilities) that should serve him well in many work situations. His verbal processing deficits are relatively circumscribed and he can work around these with appropriate accommodations."[76] Dr. O'Connor did indicate that because she was not provided copies of summary scores or raw data from prior evaluations, she was unable to definitively answer questions regarding Thompson's cognitive abilities; however, if Dr. Bookheimer is correct that Thompson's neurocognitive status has been stable since 1999, "then his functional abilities as of 4/27/05 would be characterized by many cognitive strengths (memory, divided attention, visuospatial functions and executive abilities) and moderate level problems in terms of word retrieval and processing speed."[77]

Dr. O'Connor subsequently received copies of the raw test data from Thompson's prior evaluation on May 18, 2004, and on August 10, 2006, provided an additional opinion based on that

---

[75]Doc. 45-2, p.123 (US123).

[76]*Id.*

[77]*Id.* at 124 (US124).

data.[78] Dr. O'Connor noted that Thompson scored in the high average to superior range on attention span, working memory, problem solving on Block Design and Matrix Reasoning, memory for stories, delayed story memory, immediate visual memory, delayed visual memory, visual organization, and executive functions, but scored in the average to low average range on speed of word retrieval, animal naming, supraspan memory, verbal reasoning, and category fluency. Based on this data, Dr. O'Connor opined that Thompson "has many residual cognitive strengths," and his memory for structured information is intact; however, she also indicated that Thompson "continues to demonstrate relative deficits on tasks of verbal retrieval," noting that "[t]his limitation could affect his ability to engage in activities requiring him to communicate his ideas in a timely manner.[79] Dr. O'Connor further concluded in this opinion:

> Mr. Thompson's condition is stable. He has mild to moderate level problems with regard to verbal expression. I do not expect these to change further.
>
> . . .
>
> Mr. Thompson has many intact abilities that should serve him well in many work settings.
>
> . . .
>
> Test data do not indicate that Mr. Thompson would have difficulty in the following areas: maintain persistence and pace, ability to make decisions and handle multiple sources of information, ability to deal with change and work stress and ability to manage the interpersonal demands of work.
>
> . . .
>
> [I]t is my opinion that data indicate that Mr. Thompson's cognitive abilities are generally intact with the exception of his performance on tasks related to verbal retrieval. His processing speed on many tasks was intact with the exception of those

---

[78]*Id.* at 102-04 (US102-104).

[79]*Id.* at 102-03 (US102-103).

-24-

that had high verbal demands (e.g., speed of word retrieval).[80]

### *Dr. Mike Jones*

Just under two weeks later, on August 22, 2006, another review was completed by Mike Jones, Ph.D., with Assurant Employee Benefits Behavioral Health Services.[81] Dr. Jones opined that testing indicated that Thompson would have difficulty with both confrontational naming and verbal processing speed that could affect his ability to work in high-stress situations that required quick verbal responses.[82] Dr. Jones further indicated that based on other independent evaluations, the majority of Thompson's cognitive abilities fell within the average to superior ranges, and Thompson could apply those cognitive skills "to other areas of nursing or even another occupation from nursing."[83] Dr. Jones concluded:

> Overall, no limitations were noted with Mr. Thompson [sic] ability to carry out his activities of daily living. Mr. Thompson has reported that he has self-limited his social interactions due to his embarrassment of his verbal skills. It was noted that he certainly did not have difficulty in interacting with his providers or making direct requests from them. His interactions with his providers have remained appropriate. This is not indicative of a seriously limiting social interaction problem. Testing demonstrated no difficulties with concentration. He was able to appropriately adapt to all testing situations. The results of the testing demonstrated that Mr. Thompson would certainly not be limited from performing the essential duties of any occupation.[84]

---

[80]*Id.* at 103-04 (US103-104).

[81]*Id.* at 99-101 (US99-101); Doc. 45-8, pp.129-31 (US980-982).

[82]Doc. 45-8, p.131 (US982).

[83]*Id.* Dr. Jones further calls into question Thompson's level of effort during testing based on no testing being completed to determine effort, but admits that because of the overall testing results, his point is likely moot. *Id.*

[84]*Id.*

*Richard Hubbard*

On December 28, 2004, Insurance Company referred Thompson's file to Richard Hubbard, an employee with Insurance Company's Vocational Services, to conduct a labor market survey. Hubbard identified Thompson's occupation as "nurse," which as part of the category was Thompson's regular occupation of nurse anesthesiologist. As part of this survey, Hubbard had a telephone conversation with Thompson to discuss his current status and plans.[85] During that ten to fifteen minute conversation, Hubbard represents that he found Thompson "capable of quickly and clearly responding to various questions regarding his present state of being and the performance of other jobs within his Nursing occupation. At no time did [Hubbard] feel that [Thompson's] comprehension or understanding of words heard or spoken was compromised. There was no slurring or unusual hesitation in his speech."[86] Mr. Hubbard further indicated that during this telephone call, Thompson reported experiencing two to twenty migraine headaches per day.[87] Based on this telephone call with Thompson, Dr. Horsfall's May 27, 2004 report, and both Dr. Neubauer's and Dr. Parmet's reviews, Mr. Hubbard concluded that Thompson was able to function adequately in many positions as a nurse, identifying the specific jobs of nurse consultant, office nurse, home health

---

[85]*Id.* Thompson argues that the Original Plan did not provide Insurance Company with the authority to conduct this telephone interview and claims that use of such conversation against him in determining benefits is a direct violation of the policy. In addition, Thompson argues that even if Insurance Company did have the authority, a ten minute telephone call is insufficient for Hubbard to base his impressions and ultimately, override the multiple opinions issued by medical doctors and Ph.D.'s regarding his condition. Moreover, Thompson claims there is no indication in Hubbard's report to indicate the extent of his conversation, such as whether he simply answered yes or no, or formulated extensive responses, and accordingly, Hubbard's impressions should be disregarded. While Thompson's arguments are not without merit, the Court is not inclined to completely disregard Hubbard's impressions of the call. Instead, we will weigh Hubbard's conclusions based on his qualifications and in light of the case as a whole as reflected in the administrative record. *See id.* at 141 (US992); Doc. 45-4, pp.12-14 (US294-295).

[86]Doc. 45-8, p. 141 (US992).

[87]Doc. 45-6, p.102 (US663).

nurse, and nurse case manager.[88]

On January 24, 2005, Hubbard reviewed a Labor Market Survey conducted at Insurance Company's request by Intracorp, Inc. for nurse positions within a 50-mile radius of Wichita, Kansas.[89] From this survey, Hubbard opined that the Wichita job market offered Thompson potential employment as a nurse with the expectation of earning at or above $8.65 per hour within Thompson's physical capacity.[90] Identified were a number of positions, including nurse consultant, office nurse, telephonic medical case manager, school nurse, medical laboratory technician, and home health nurse.[91]

### Ted Thompson Statement

In October 2005, Insurance Company requested additional documentation from Thompson relating to his prescriptions and the pharmacies he used.[92] Insurance Company indicated that without the information requested, its "review of this claim may not demonstrate an accurate picture of Mr. Thompson's condition." In addition to the pharmacy and prescription records, Insurance Company requested that Thompson provide a written narrative stating "what he believes he is unable to do and why he is unable to do that task/activity," and specifically address how those claims relate to his daily living, as well as to "his ability to perform any occupation for which he might be suited by

---

[88]Doc. 45-8, p. 141 (US992).

[89]Doc. 45-4, pp.96-109 (US377-390); Doc. 45-6, pp.79-96 (US640-657).

[90]Doc. 45-6, p.86 (US647).

[91]Doc. 45-4, pp.96-109 (US377-390); Doc. 45-6, pp.79-96 (US640-657).

[92]Doc. 45-6, p.86 (US647).

education, training and experience."[93]  Thompson's narrative, sent to Insurance Company's appeals specialist on December 16, 2005, states:

> Because of the variable nature and intensity of the atypical migraines I experience, I would probably have a difficult time in a full-time position, knowing that I frequently suffer migraines so severe that they require me to immediately lie down. I also experience left-sided facial and left-hand numbness which comes on abruptly and lasts between fifteen minutes to an hour.  In addition, I experience episodes of dizziness and poor balance. Although I hope to be able to work some day in the future, my physician feels that at present, the unpredictable nature of the migraines and the episodes of numbness and dizziness prevent me from performing the duties or bearing the responsibility in a medical setting where patients and physicians would depend on me for quick action and judgment. Stress seems to increase the frequency and intensity of my symptoms.  I am better able to function in a relaxed and structured environment; however, if a decision needs to be made, I have difficulty making decisions and am unable to respond rapidly to an emergency situation.  I have difficulty with remembering names, and I have a decrease in short-term memory in general. (Often times I cannot concentrate or complete relatively easy tasks when I am pressed for time. In those cases, I usually can finish them, it will just take longer.)

> I have particular difficulty in measures requiring quick responses.  Due to my difficulty with verbal expressions and processing, I could not competently take care of patients.  I am also limited in my ability to converse both on the telephone and in person as I have difficulties formulating responses and sometimes it may take several minutes for me to be able to respond properly.  I have difficulty in expressing myself, especially when a quick response time is needed.

> With regard to my activities of daily living, as long as I am not experiencing a migraine or episode of dizziness, I am able to perform most of my activities adequately.  However, when I have a severe migraine, I am unable to do any activity as I am immediately bedridden. I have noticed that when I lean my head back and look up towards the ceiling, it can trigger an episode so I have had to modify my activities to account for this problem.  Some of the activities that I have had to stop or limit include painting, hanging pictures, changing light bulbs, moving items out of the attic, hanging curtains/blinds, tree trimming, putting up holiday decorations, and leaning my head back when I wash my hair in the shower.

> My verbal expressive problems are present even if I am not having an episode.  I try to stay out of situations where I have to do anything verbally.  As such, I generally have to avoid doing things in a social setting or involving people do not know.  I have problems with holiday activities, entertaining, going to parties, visiting friends,

---

[93]Doc. 45-9, p.33 (US1026).

meeting new people, and attending church when it involves activities. I experience anxiety, embarrassment, fear and self-doubt when I am around people I do not know as I can't seem to find the right words. Due to my difficulties in expressing myself, I feel more isolated as I find I'd rather be alone than to be around people.

The unpredictable, yet relatively frequent nature of my migraines and dizzy spells is a problem to cope with. However, most physical activity does not bother me. Extreme exertion or heavy lifting is a permanent limitation because that could cause potential new dissections. Again, stress seems to aggravate my symptoms. I cannot do any physical activities that involve looking up or extending my neck too much.

I hope and believe that some time in the future I will be able to work again. My treating doctor thinks that at present I cannot.[94]

### *Karen Sherwood*

On September 18, 2006, Thompson's file was referred to Karen Sherwood, of Insurance Company' Vocational Services, to determine whether the jobs identified in the January 18, 2005 Intracorp survey remained valid options for employment based on Dr. O'Connor's June 6, 2006 and August 10, 2006 reports,[95] along with Dr. Mike Jones review of Dr. O'Connor's reports in which he opined that testing indicated Thompson would have difficulties with confrontational naming and his verbal processing speed.[96] Ms. Sherwood concluded, based on the findings in these reports, that the only positions identified in the labor market survey report that remained valid were that of Telephonic Medical Case Manager and Medical Case Manager - Field Nurse. Ms. Sherwood eliminated the remaining positions because they did not meet the gainful wage requirement, did not

---

[94]Doc. 45-3, pp.117-9 (US257-259). Thompson asserts that this narrative was not provided to any person reviewing his appeal, but instead, was only forwarded to a private investigator hired by Insurance Company to perform surveillance on him solely to gain information to deny his appeal, which he claims demonstrates bad faith on the part of Insurance Company in providing him a full and fair review.

[95]Doc. 45-2, p.98 (US98).

[96]*Id.* at 99-101 (US99-101).

fall within the occupation of "nurse," or required direct patient care.[97]  "It was felt that administering treatments, or being involved in the care of patients could potentially pose stressful situations.  These positions, would therefore, be inappropriate for the claimant due to this verbal processing difficulty."[98]

    As previously stated, Thompson has the burden to prove by a preponderance of the evidence that he is disabled within the meaning of the Plan.[99]  Insurance Company suggests that this means Thompson must prove that he cannot perform "<u>any</u> occupation for which he is qualified and which pays at least $1,500 per month; i.e., a 'gainful occupation.'"[100] Insurance Company argues that "each gainful occupation" is defined to include *all* occupations for which Thompson is qualified that pays at least $1,500 per month, and therefore, contrary to Thompson's claim that he is only qualified to work as a nurse anesthetist, includes nursing positions outside of that specialty.  Insurance Company argues that to read the second part of the Occupation Test any differently would render the first part meaningless.

    The "Occupation Test" provides that:

during the first 27 months of a period of disability (including the qualifying period), an injury, sickness, or pregnancy requires that you be under the regular care and attendance of a doctor, and prevents you from performing at least one of the material duties of your regular occupation, and

after 27 months of disability, an injury, sickness, or pregnancy prevents you from performing at least one of the material duties of each gainful occupation for which

---

[97]*Id.* at 98 (US98).

[98]*Id.*

[99]*Niles*, 563 F. Supp. 2d at 1214-15 (citing *McGee*, 953 F.2d at 1205).

[100]Doc. 98, p.22 (Insurance Company Motion for Summary Judgment).

your education, training, and experience qualifies you.[101]

Neither party denies that Thompson received the benefits to which he was entitled during his first 27 months (Part 1) of disability as provided by the Plan.[102]  Instead, this matter turns on the second part (Part 2) of the Occupation Test.  To be disabled within the meaning of Part 2, Thompson must prove that his injury prevents him from performing at least one of the material duties of each gainful occupation for which his education, training, and experience qualifies him.[103]

Thompson first contends that because of his education, training, and experience over 27 years of working as a CRNA, he is qualified to work *only* as a CRNA, and can work in no other position. He argues that his education consists of an advanced degree in a highly specialized and technical position that requires precision work and a high degree of critical thinking.  Thompson further asserts that while a nursing degree is a prerequisite to obtaining a masters and certification as a CRNA, a CRNA is a functionally distinct position from other registered nursing positions.

Thompson claims that his CRNA position is more analogous to an actual anesthesiologist, a medical doctor, than to an RN.  Specifically, Thompson contends his CRNA practice required him to: (1) perform and document a pre-anesthetic assessment and evaluation of the patient; (2) develop and implement an anesthetic plan; (3) initiate the anesthetic technique, which may include general, regional, and local anesthesia, and sedation; (4) select, obtain, and administer the anesthetics,

_____

[101]Doc. 45-2, p.10 (US10).

[102]Thompson does at one point argue, based on a letter received from Insurance Company, that he was entitled to 36 months of disability pay under Part 1 of the Occupation Test.  Thompson, however, has failed to provide the Court with any evidence demonstrating that a plan was in place at any time providing for 36 months of disability rather than the 27 months indicated in the very plan that he contends governs his claim.  Therefore, we find that Thompson's argument on this point is without merit.

[103]*See* Doc. 45-2, p.10 (US10).  The Court notes that there is no meaningful difference between the Original Plan and the 2004 Plan with respect to the criteria for determining whether or not Thompson is disabled "under the terms of the plan."

adjuvant and accessory drugs, and fluids necessary to manage the anesthetic; (5) manage a patient's airway and pulmonary status using current practice modalities; (6) facilitate emergence and recovery from anesthesia by selecting, obtaining, ordering and administering medications, fluids, and ventilatory support; (7) discharge the patient from a post-anesthesia care area and provide post-anesthesia follow-up evaluation and care; (8) implement acute and chronic pain management modalities; and (9) respond to emergency situations by providing airway management, administration of emergency fluids and drugs, and use basic or advanced cardiac life support techniques. Thompson further argues that, in contrast to the typical registered nursing position, as a CRNA he had a lesser involvement in patient interaction and desk work and mainly worked with data and instruments. He claims that performing this type of specialized work over such a long period of time, including his focused education and training, has narrowed and refined his specialty to such a degree that he is unqualified to work in other registered nursing positions. Thus, he claims he is entitled to benefits under Part 2 of the Occupation Test.

Insurance Company disagrees that Thompson is only qualified to work as a CRNA and asserts that Thompson's education, training, and experience provide him with transferrable skills that qualify him for other positions as a nurse. Further, Insurance Company argues that Thompson's interpretation of the "each gainful occupation" definition would render it superfluous to the "regular occupation" definition of Part 1. We agree.

Under Part 2 of the Occupation Test, "gainful occupation" is modified by the phrase "for which your education, training, and experience qualifies you." This limiting language does not require that other gainful occupation be an exact fit to Thompson's previous position as a CRNA, but more likely, was intended to ensure that Thompson education, training, and experience allowed

him to meet the minimum requirements of the positions.  To find otherwise would, as Insurance Company suggests, cause Part 1 of the Occupation Test to be meaningless.

Thompson also possesses certification as an RN, and while over the years he obtained other specialized training, education, and experience that allowed him to perform his duties as a CRNA, he still retains the qualifications necessary to perform in other nursing positions – positions that remain within the medical field and require that he maintain his certification as an RN.  And while it is likely true that Thompson has focused this training throughout the years to his CRNA position, that focus does not preclude his ability to utilize his nursing degree in other areas of nursing.

Thompson next claims that even if the Court finds that he is qualified to work in positions other than as a CRNA, he is unable to perform the material duties required by those positions due to his medical disability.  Thompson claims that as part of any nursing position, including those positions suggested by Insurance Company as appropriate "gainful employment" under the terms of the Plan, the ability to communicate well is critical, as is the ability to work well under pressure, and to think and act quickly.[104]  Thompson argues that these requirements are in conflict with Dr. Fisher's, Dr. Horsfall's, and Dr. McPherson's opinions that he was unable to work under pressure, and had a marked inability to think and act quickly.  Thompson further argues that as these opinions further indicated, his severe language deficit, which causes him to at times take up to four minutes

---

[104]Thompson points the Court to an Internet website for O-Net, http://online.onetcenter.org/link/details/29-1111.00, which Insurance Company referenced in the administrative record as a source of information for its findings relating to positions that would qualify as "gainful occupations" for Thompson.  This reference to information outside the administrative record appears to be the subject of Insurance Company's Motion in Limine, which requests that the Court exclude information not in the administrative record or permitted by prior court order.  Because the Court finds the descriptions of potential "gainful occupations" provided in the administrative record sufficient, we find no need to look to outside sources.  It is unclear whether Insurance Company intended its Motion in Limine to cover any other specific information; however, because the Court limits its review to the administrative record and items permitted by the Court's prior order on discovery, the Court grants Insurance Company's Motion in Limine with respect to Thompson's reference to O-Net.

to complete a phrase or formulate a response, would preclude his ability to perform the material duties of Insurance Company's proposed "gainful occupations," or any other nursing position.

Insurance Company contends that Thompson is fully capable of performing in the positions it has identified as "gainful occupations" during its review of his disability claim. In support of its position, Insurance Company relies on the opinions of Thompson's treating physicians and neurologists, along with its own in-house and independent medical records reviews. Based on these opinions, Insurance Company contends that because Thompson has many cognitive strengths, he is capable of working outside of high-stress jobs in the nursing field that permit him to work at a slower, more relaxed pace and that do not involve lifting patients or require quick verbal responses.

After reviewing the administrative record and the parties' briefing, the Court concludes that Thompson has met his burden of proving by a preponderance of the evidence that he is unable to perform at least one of the material duties of each gainful occupation for which his education, training, and experience qualifies him, and thus, he is entitled to disability benefits under the plan.[105] Insurance Company makes much argument about Thompson's cognitive and physical strengths, and while we do not discount those strengths, in the end it comes down to what Thompson is unable to do as a result of his cognitive disorder that determines whether he is entitled to disability benefits under the Plan. It is clear from the record that Thompson's condition has resulted in severe cognitive deficits affecting his verbal expression. In addition, Thompson remains vulnerable to continued episodes of severe migraine headaches, apparently brought on by stress and without notice that, for

---

[105]The modifying language of Part 2 of the Occupation Test supports the proposition that to satisfy Part 2 under the Plan, the "gainful occupation" must be in an area within the medical profession. Importantly, Insurance Company in this case, through its employees and independent reviewers, has consistently interpreted and applied Part 2 during its review looking solely to positions in the nursing profession. *See, e.g.,* Doc. 45-2, p.98 (US98). (Karen Sherwood, Insurance Company representative, interpreting Plan to exclude positions outside that of the nursing profession). Thus, in this case, a "gainful occupation" under the Plan must relate to the nursing profession.

all practical purposes, incapacitates him and requires that he cease all activity and lie down until the episode subsides. Even as late as August 2005, Dr. Fisher evaluated Thompson and found that he continued to demonstrate a significant delay in verbal expression and processing, and remained at risk of recurring medical episodes. Based on his knowledge of nursing duties, Dr. Fisher believed that Thompson was extremely limited in working in any nursing position due to the unpredictable nature of his vasospastic migrainous events and his verbal deficiencies.

Thompson's cognitive deficits were again noted by Drs. Horsfall and Bookheimer during their evaluation of Thompson in May 2004. At that time, they noted that testing suggested "substantial deficits in verbal expression and processing."[106] On naming tasks where he was under time pressure to respond, Thompson performed at a third-grade level. Where he had no time pressure, he retrieved words without problem. They further noted a decline in Thompson's verbal learning and expression during this evaluation, and recommended he be placed on an alternative medication for his migraines that would have a lesser effect on his cognitive abilities. Dr. Fisher responded to that request, indicating that altering Thompson's medication was not an option as he did not adequately respond to alternative treatment for his migraines. While Drs. Horsfall and Bookheimer recommended that Thompson not return to work as a CRNA due to his difficulties with expression and verbal deficits, they indicated he still might do well with the intellectual tasks involved in nursing where he could work at a slower, relaxed pace, and where he had sufficient time to respond and process information. Drs. Horsfall and Bookheimer, however, concluded that given Thompson's declined performance on certain tasks, he might benefit from reevaluation in the future to determine any change in his abilities. Thereafter, Dr. Fisher performed several follow-up

---

[106]Doc. 45-4, p.85 (US366).

evaluations on Thompson, as previously discussed.

Dr. Parmet determined from the medical records that Thompson retained sufficient cognitive function and physical ability to perform "many other positions as a nurse," but not as a CRNA because of the complex problem solving and timely decision making required in that specialty. While Dr. Parmet noted that Thompson was physically capable of performing his occupation as a nurse, he recommended a vocational assessment to determine appropriate employment for Thompson based on his residual abilities, which in the context of his report, would require taking into account Thompson's verbal deficits and effects of migraine episodes.

Dr. Zimmerman, also consulting for Insurance Company, also concluded in his April 2006 review that Thompson was capable of medium work activity on a full-time basis, but is precluded from critical situations requiring acute judgment. While Dr. Zimmerman's conclusion appears to be based on certain aspects of Thompson's medical and work history both before and after his 2003 event, it is unclear whether Dr. Zimmerman considered Thompson's more recent presentations in 2005 as reflected in Dr. Fisher's August office notes and September 2005 evaluation summary. Dr. Zimmerman acknowledges Thompson's gastrointestinal complaints from August 2005, but his report fails to mention Dr. Fisher's notations from that same evaluation that Thompson had also been experiencing migrainous vasospasm spells two to three times a week that occurred abruptly and without warning and lasted fifteen to sixty minutes in duration, and was demonstrating very slow speech.[107] Dr. Zimmerman also appears to have considered Mr. Hubbard's conclusions from his short telephone call in December 2004 with Thompson regarding Thompson's ability to answer questions, but appears to have failed to take into account the subsequent evaluations and opinions

---

[107]Doc. 45-2, p.139 (US139); Doc. 45-3, p.66 (US206).

of Dr. Fisher or Thompson's own opinion of his condition and limitations, which were part of his record at the time of his review.

In August 2006, Dr. O'Connor also recognized that Thompson had reduced performance in verbal retrieval, and specifically noted that "[t]his limitation could affect his ability to engage in activities requiring him to communicate his ideas in a timely manner."[108]  While Dr. O'Connor opined that Thompson retained many abilities that would serve him well in many work settings, her reports are silent as to whether she was referring to the area of nursing or some other occupation. Nonetheless, Dr. O'Connor found Thompson's abilities to communicate diminished.

Dr. Jones August 22, 2006 review of Thompson's records appears to have relied almost entirely on the opinion of Dr. O'Connor, referencing Dr. Bookheimer's opinions only in the context noted by Dr. O'Connor in her report.  Dr. Jones failed to mention any progress report or evaluation conducted by Dr. Fisher or any other of Thompson's treating physicians, other than referring to items specifically noted by Dr. O'Connor.  Dr. Jones' review further fails to indicate whether any of Insurance Company's other reviewers' opinions were considered.  Dr. Jones concludes, as does the majority of Insurance Company's reviews, that Thompson's cognitive deficiencies preclude him from performing as a CRNA, but those same deficits in verbal expressing and processing do not preclude him from performing as a nurse or even another occupation within the nursing profession. Also similar to Insurance Company's reviewers' opinions, Dr. Jones reports fails to indicate how Thompson's continued migraine episodes and their resulting effects, induced by stress, would impact his ability to perform in said nursing occupations.

Karen Sherwood, who conducted the final vocational review during Thompson's appeal,

---

[108]Doc. 45-2, p.103 (US103).

concluded that the only two occupations identified in their labor market survey that qualified as gainful occupations under the Plan were Telephonic Medical Case Manager and Medical Case Manager, Field Nurse. A Telephonic Case Manager position, as described in the Intracorp report, requires the use of a telephone to provide case management services for worker's compensation injuries and hospital bill review.[109]  It was determined that Thompson had the capacity to perform this job without any modifications to the position's requirements. Similarly, a Medical Case Manager, Field Nurse requires the ability to communicate with adjusters, injured workers, employers, physicians and other health care providers and assist with an injured worker's return to work in a timely manner. Further, this position requires the ability to communicate with all parties, and requires travel to various doctor's offices within the relevant community.

It is interesting that various positions were eliminated from Thompson's list of "gainful occupations" initially identified during Insurance Company's labor market survey because such positions were inappropriate due to Thompson's verbal processing difficulty, yet these two remaining positions require the ability to effectively communicate by telephone or in person with various care providers and injured workers, which Thompson's physicians, along with Insurance Company's independent reviews, have identified as a deficit that could affect his ability to perform.

Even without the labor market survey, which Insurance Company contends it was not required to perform, the Court would reach the same conclusion. Thompson continues to experience difficulties in communication, and because of the high probability of recurring stress-induced migraines, which occur with minimal to moderate stress, or at times, no precipitating event at all, it is highly unlikely that he would be able to perform the material duties of any position in the

---

[109]Doc. 45-6, p.89 (US650).

nursing field or medical profession. It is inconceivable to this Court that there exists a nursing position that either does not require effective communication with medical personnel, patients, insurance providers, or other medical staff. Moreover, common sense alone indicates that any nursing position, or for that matter, any position in the medical field, involves a degree of stress that, based on the opinions in the administrative record, would place Thompson at risk of recurring migraine episodes that, as previously discussed, would prevent him from being able to adequately perform the material duties of these occupations. While we note that Thompson does not constantly experience these symptoms, we believe that they occur with such frequency and without warning so as to preclude him being able to work in the nursing field.

Therefore, after a thorough review of the administrative record, we conclude that Thompson qualifies for benefits under Part 2 of the Occupation Test of the Plan, and we set aside Insurance Company's decision denying benefits.


## 2. Breach of Fiduciary Duty

Insurance Company contends it is entitled to summary judgment on Thompson's breach of fiduciary duty claim brought pursuant to 29 U.S.C. § 1132(a)(3). Thompson initially claimed that Insurance Company breach its fiduciary duties by failing to provide adequate and timely services, documents, and information under the Plan, and failed to provide a full and fair review under ERISA. Thus, Thompson claimed he was entitled to specific performance of benefits in the future pursuant to the Plan. Thompson also requested injunctive relief, asking the Court to preclude Insurance Company from administering any ERISA plan in the future.

In his Response to Insurance Company's Motion for Summary Judgment, Thompson appears

to have abandoned his claim for breach of fiduciary duty, and he does not argue this claim in his cross-motion for summary judgment. In the introduction to his brief, Thompson sets forth instances for what he claims establishes both Insurance Company's bad faith and a pattern or practice of fiduciary violations; however, Thompson indicates that Kimberly Myer no longer works for Insurance Company and no longer has access to company documents which would prove system wide abuse of claims. Further, Ms. Myer has claimed to have little memory of Thompson's case. Therefore, in lieu of his claim for injunctive relief, Thompson requests that all protective orders in this case be lifted, and that his counsel be permitted to turn his entire file over to applicable state and federal authorities for investigation.

The only protective order issued in this case deals with the scope of discovery permitted to take place outside that which was in the administrative record. We find no protective orders that apply to the administrative record, nor to we find any documents that have been filed under seal. As such, there are no protective orders in this case that apply to Thompson's request. And because there are no documents filed under seal, the pleadings, motions, and attachments, which includes the administrative record in this case, are a part of the Court's record and are public. As a result, Thompson does not require the Court's permission to permit persons to view what is now a matter of public record, and because Thompson's claim for relief is addressed according to the Court's ruling with respect to it *de novo* of his denial of benefits, we deny this request as moot.

### 3. Attorney's Fees

In addition to his request for disability benefits, Thompson seeks attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). However, pursuant to Fed. R. Civ. P. 54(d)(2) and D. Kan. R. 54.2,

Thompson's motion is premature, and therefore, we deny said request for attorney's fees without prejudice.

**4. Motion for Hearing**

Thompson also moved the Court for a hearing on his Motion for Summary Judgment if the Court determined that one would be helpful in deciding the issues presented. The Court find a hearing is not required, and therefore, Thompson's Motion for Hearing (Doc. 116) is denied.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff Ted Thompson's Motion for Summary Judgment (Doc. 99) is hereby GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff Ted Thompson's Motion for Hearing (Doc. 116) is DENIED.

**IT IS FURTHER ORDERED** that Defendant Union Security Insurance Company's Motion for Summary Judgment is DENIED and Motion in Limine is GRANTED (Doc. 97).

**IT IS SO ORDERED.**

Dated this 3rd day of February, 2010, in Wichita, Kansas.

/s Eric F. Melgren                          
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE